ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | |
| | ) | |
| Mary Roe 1818, | ) | SUMMONS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | FILE NO. 21-CP-10-_____ |
| The Bishop of Charleston, a Corporation | ) | |
| Sole, and The Bishop of the Diocese of | ) | |
| Charleston, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the subscriber, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Mt. Pleasant, South Carolina

s/Lawrence E. Richter, Jr.
The Richter Firm, LLC
Lawrence E. Richter, Jr.
Anna E. Richter
622 Johnnie Dodds Blvd.
Mt. Pleasant, SC  29464
843-849-6000
Attorneys for Plaintiff

January 4, 2021

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FOR THE NINTH JUDICIAL CIRCUIT |
| COUNTY OF CHARLESTON | ) | CA No. 21-CP-10-_____ |
| | ) | |
| Mary Roe 1818, | ) | COMPLAINT |
| | ) | **Jury Trial Requested** |
| Plaintiff, | ) | |
| | ) | Outrage/Intentional Infliction of Emotional |
| | ) | Distress, Negligence/Gross Negligence, |
| vs. | ) | Breach of Fiduciary Duty, Fraudulent |
| | ) | Concealment, Civil Conspiracy, Negligent |
| The Bishop of Charleston, a Corporation | ) | Retention or Supervision, Breach of |
| Sole, and The Bishop of the Diocese of | ) | Contract, Breach of Contract Accompanied |
| Charleston, in his official capacity, | ) | by a Fraudulent Act |
| | ) | |
| Defendants. | ) | |
| | ) | |

TO:     THE DEFENDANTS ABOVE NAMED

Plaintiff, complaining of the Defendants, alleges and says:

## PARTIES AND JURISDICTION

1.      Mary Roe 1818 is a pseudonym for a former Charleston County resident who, while living in the Charleston area, attended schools and churches operated by the Defendants and attended and participated in mass, confession, religious training, and various religious and non-religious functions sponsored and operated by the Defendants.  Plaintiff is identified in this Complaint by a pseudonym because this is a case about childhood sexual abuse upon her.   Plaintiff's identity has been withheld due to the sensitivity and private nature of the allegations contained herein.  Plaintiff's identity will be disclosed to the Defendants upon their written agreement to maintain her identity as confidential as to the public record, or, if Defendants do not consent, after obtaining affirmative relief by the Court.  Plaintiff is a citizen and resident of the state of North Carolina.

2.     Defendant The Bishop of Charleston, a Corporation Sole (hereinafter referred to as "Diocese"), and/or its predecessors, is, and was at all times material hereto, a corporation organized under the laws of the State of South Carolina having its principal place of business in Charleston County, South Carolina.  The Diocese is and was the corporate entity through which the religious and other affairs of the Roman Catholic Church (the "Church") in South Carolina are and were conducted.  The Diocese and its agents and employees were and continue to be responsible for the selection and assignment of clergy, acts of clergy, supervision of clergy and its lay employee activities, the exercise of authority over the various members of its denomination, and the maintenance of the well-being of its members, spiritual and otherwise.

3.     The Bishop of the Diocese, presently the Most Rev. Robert E. Guglielmone, is sued in his official capacity as successor in interest of prior Bishops of the Diocese.  He and his predecessors are referred to in this Complaint as the "Bishop" and the Diocese and Bishop are collectively referred to as the "Diocese Defendants," unless otherwise specifically referred to.  The Bishop is the formal head of the Diocese.   Under the administrative structure of the Church, the Bishop possesses all executive, legislative, and judicial power within the Diocese.   The Bishop is ultimately responsible for the priests and others employed by his Diocese.  Bishops are selected by, and answerable to, the official colloquially known as the Pope.  Each Bishop in his official capacity is the successor in interest to the former Bishops in their respective official capacities.

4.     The Diocese Defendants operate churches and parochial schools throughout South Carolina, including in Charleston County, offering primary, elementary, and secondary educations.  The Diocese Defendants hold certain assets including schools, rectories, churches, and other properties real and personal in Charleston County and throughout South Carolina and possibly

2

elsewhere. Such properties include Saint John Catholic Church in North Charleston, South Carolina and its school known as Saint John Catholic School (hereinafter collectively referred to as the "Saint John Catholic Church and School"), as well as Church of the Nativity, Holy Spirit and the Nativity Catholic School all located in Charleston County, South Carolina.

5.     At all times material to the incidents alleged in this Complaint, Frederick Austin McLean ("McLean") was a priest under the direct supervision, employ and control of the Diocese Defendants. McLean was assigned by the Diocese Defendants to various churches or Diocesan facilities, including St. John Catholic Church and School, and served as pastor, mentor, teacher, youth leader, confessor, and counselor to many parishioners in these assignments, including the Plaintiff and her family.   He visited in parishioners' homes and came to know the adults and children in the various families of the parish. He even oversaw and cared for the children of the parish both in and outside their homes, Plaintiff included. McLean was housed by the Diocese Defendants in the rectory on or around the grounds of Saint John Catholic Church and School. McLean died in 2010 and therefore is not a party to this action.

6.     This Court has jurisdiction over the parties and subject matter of this action, and venue is proper in Charleston County.

### GENERAL ALLEGATIONS

7.     The Diocese Defendants, priests of the Diocese, including McLean, as part of their general mission, encouraged its parishioners, such as the Plaintiff, to enter, use, and attend its many activities on its premises and otherwise, including school, worship, social, and religious based functions, as well as illegal gambling operations including bingo, raffles, drawings, door prizes, lotteries, and other games of chance.  As such, the Diocese Defendants undertook a duty to ensure its

3

premises, functions, and activities were lawful, proper, and safe from all dangers which were reasonably foreseeable. In particular, the Diocese Defendants owed minors, including the then minor Plaintiff, a greater degree of care because of their lack of capacity to appreciate risks and avoid danger. The Diocese Defendants represented to its parishioners, including the Plaintiff and/or her parents, that its facilities and functions, including those of McLean, were places and actors of safety, and that they would protect parishioners and participants, including the Plaintiff, from harm.

8. At all times relevant, the Diocese Defendants owned and operated schools, including the St. John Catholic School, operated as a commercial enterprise to make a profit. By way of example, on information and belief, the Saint John Church School required anyone who wants to attend the school to pay a sum of money for the services provided by the school in the form of tuition. Multiple tuition rates are utilized, including one for parishioners of parishes on the Charleston peninsula, a higher rate for parishioners of non-peninsula Catholic parishes, and another rate for non-Catholic students. Upon information and belief, the Diocese Defendants did and does purchase books, supplies, clothing, and other items, marks up the price, and sells the items for a profit. Such an exchange of money goods and services is a business venture. The Diocese Defendants used the profits from such business ventures to house, feed, and otherwise financially support its priests, agents, and employees, including McLean, and to cover the various costs associated with Diocese Defendants hiding and/or covering up the sexual abuse of minors by its priests and other agents.

## FACTUAL SUMMARY

9. Plaintiff was born in 1959, the fourth out of five siblings. Plaintiff was raised by her mother and father and in the Catholic Church, including Saint John parish.

4

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

10.     Plaintiff and her family were members of Saint John Catholic Church in North Charleston, South Carolina. Plaintiff attended Saint John Catholic School for her early school years and then completed her remaining education at the Nativity Catholic School (the "Nativity School"), another parochial school tied to, associated with, and governed by the Diocese Defendants, the Church of the Nativity, Holy Spirit and Our Lady of Good Counsel.

11.     Saint John Catholic Church and School were within walking distance of the Plaintiff's childhood home that she lived in until about the third grade, when she moved and began attending the Nativity School. On the grounds of Saint John Catholic Church were a rectory and convent, housing religious personnel of the Diocese and particularly St. John Parish. As such, the priests and nuns living in the rectory and convent at Saint John Catholic Church were neighbors of the Plaintiff's first childhood home.

12.     Plaintiff attended Saint John Church and School as a child and actively participated in school and religious based activities, as did her family members. McLean was employed by the Diocese Defendants as a priest, mentor, youth leader, confessor, counselor, and in a position of authority over plaintiff at the relevant times. In this role, McLean came to have access to and to know the most personal and confidential information of his parishioners, including the plaintiff and plaintiff's family. The Diocese Defendants encouraged their parishioners to share and trust McLean as a priest, youth leader, mentor, confessor, counselor, and put McLean in a position of authority over plaintiff. Among other things, the Diocese Defendants encouraged plaintiff, plaintiff's family, and other parishioners to share with and trust McLean, and other of its employees, deeply personal information and with their personal safety and salvation. As part of his employment, McLean reached out to parishioners of the Diocese and assisted the defendants in cultivating relationships of

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

trust and confidence.

13.     Plaintiff came to know the priest McLean through Saint John Church and School, and through counseling and mentoring offered by McLean to plaintiff and her family.  As cultivated and encouraged by the Diocese Defendants, the Plaintiff admired, trusted, revered and respected all priests, McLean included, as holy men, mentors, authority figures, confessors, clergymen, counselors and teachers.  In school and church, the Plaintiff was taught and instructed to do so and Plaintiff heeded such instruction always.

14.     McLean had a close relationship with Plaintiff's family, he would often come over to the Plaintiff's home.  On occasions, McLean would watch the Plaintiff and her sister unsupervised, as a caretaker.

15.     Because of Plaintiff's position of vulnerability, together with McLean's status as a priest, youth leader, holy man, mentor, confessor, counselor, and authority figure to the Plaintiff, McLean was able to exert control and influence over Plaintiff and her siblings.  By his words and actions, McLean represented to the Plaintiff and plaintiff's family that their relationship was one in which McLean was to provide counseling, comfort and advice, and to look out for and protect plaintiff's well-being and best interests.  These representations were untrue and intended to deceive the Plaintiff and plaintiff's family.  McLean used these representations, the Plaintiff's vulnerability, and his various positions to gain the Plaintiff's and her mother's trust and confidence and to obtain power and control over the Plaintiff and the other family members.

16.     Plaintiff remembers McLean watching her and her sister when she was a young child.  While babysitting Plaintiff and her sister, McLean used these opportunities to sexually assault the Plaintiff and her sister. Plaintiff specifically recalls McLean lying on the couch and inviting the

6

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

Plaintiff and her sister to sit on his lap for a "pony ride". McLean placed plaintiff on his crotch, holding on to plaintiff's waist while moving her up and down on his erect penis. Plaintiff recalls McLean doing the same thing to her sister. Plaintiff recalls it hurting.

17.　　This abuse took place during the Plaintiff's formative years as a child; between 1961 and 1966 when, upon information and belief, McLean left the church and active ministry.

18.　　Because Plaintiff was a minor child, Plaintiff was unable to recall and understand the impropriety, wrongfulness and illegality of McLean's sexual abuse of her and the related injury. Plaintiff now has come to recall and understand why she felt anxious, distressed, threatened, and fearful in the presence of McLean and otherwise. It was because of his horrible violations of her.

19.　　In the years that followed the abuse, the Plaintiff's parents sent her to Saint John Catholic School. In church and school, the Plaintiff was taught that she must obey and comply with the rules, teachings, doctrines, and instructions of the Church. In addition to the constant reminders of her duty of obedience as a student and minor, the Diocese Defendants cultivated a culture of trust and confidence in its officials and Plaintiff, therefore, was instructed and led to believe, by the Diocese, the Bishop, and their priests, agents and employees such as McLean, that officials such as McLean were holy men and authority figures. To allege that a holy man had committed a horrible wrong against her would risk disbelief, excommunication, and/or an afterlife of damnation. Plaintiff continued to repress her memories of the sexual abuse. Plaintiff only learned within the past few months of the causal relationship between her injuries and the sexual abuse, as well as the Diocese Defendants' knowledge of McLean's proclivities and actions, and has similarly only then learned of the Diocese Defendants' concealment and effort to maintain secrecy concerning the acts of McLean and other priests who sexually abused children. Other litigation, news reports, and other occurrences

7

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

have led to the Plaintiff now becoming so aware, and the Plaintiff could not have so known or learned previously. Plaintiff's memories of the aforementioned abuse were repressed; she disassociated. Plaintiff's memories have only recently begun to resurface, within the past couple of years.

20.     The realization that McLean sexually molested the Plaintiff and her sister as young girls has turned the Plaintiff's world upside down. Plaintiff has only learned within the past few months of the causal relationship between her injuries and the sexual abuse, as well as the Diocese Defendants' knowledge of McLean's history, proclivities, and actions, including sexually abusing children and parishioners, and has similarly only then learned of the Diocese Defendants' concealment and effort to maintain secrecy concerning the acts of McLean and other priests who sexually abused children.

21.     The Defendants who are in possession of the Diocese personnel file and other official records have refused to allow abuse victims to see these records and continue to hide such records today.

22.     As a result of the actions and/or inactions of the Diocese Defendants, and through the operation of the commercial and/or illegal gambling operations described herein, McLean was allowed, and did, prey upon the Plaintiff by engaging in the defined "worst sin" (as further defined herein). Plaintiff has suffered from McLean's conduct and the conduct of the Diocese Defendants, including psychological damage, guilt, shame, loss of the enjoyment of her family and life generally, lack of self-worth, and depression, with physical manifestations, all as a direct and proximate result of the substantial abuse Plaintiff endured, inflicted by McLean and the Defendants whose agent he was.

23.     Plaintiff's severe psychological damage, the equivalent of a misshapen mind, and physical manifestations associated therewith, were directly and proximately caused by the actions and/or inactions of the Diocese Defendants[1] and by McLean's direct acts; and said damage prevented the Plaintiff from recognizing, understanding, and asserting her legal claims relative to the childhood sexual abuse she suffered at the hands of McLean and the coverup and hiding all the Diocese Defendants until now.

## FOR A FIRST CAUSE OF ACTION:
### (FRAUDULENT CONCEALMENT)

24.     The allegations of paragraphs 1 through 23 above are incorporated into this cause of action as if fully stated herein.

25.     The Diocese Defendants had a duty to discover, and to disclose to Plaintiff and her family, their knowledge that McLean had sexually deviant propensities, including sexual interest in children, and had acted on those propensities, such that McLean's sexual molestation of Plaintiff and other victims could have been avoided in the first place or, if not avoided, that the damage done to the Plaintiff and other victimized children could have been promptly addressed by their families and/or their churches and schools after the fact, had they been informed of such occurrences.

26.     The duty imposed on the Diocese Defendants arises from: (i) the Diocese Defendants' superior knowledge about the danger McLean represented to children; (ii) the awareness by the Diocese Defendants that McLean had molested children; (iii) the operating administrative practice of the Diocese Defendants at all relevant times hereto that charged the Diocese with a duty to discover victims of known sexual molesters within the Diocese (i.e., priests, agents and employees), as

---

1 The Diocese has finally acknowledged on March 29, 2019 that McLean is known to it as a sexual predator, a

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

detailed herein; and (iv) the undertaking of such duty, which the Diocese Defendants assumed in a negligent, grossly negligent and/or reckless fashion.

27.     Instead of adhering to these duties and providing notice and full disclosure, the Diocese Defendants have operated with secrecy and concealment of all aspects regarding sexual abuse by their priests, agents, and employees, McLean included.   In their own internal operations, the Church required its officials, agents and employees, including the Bishop, to further conceal its knowledge of abuse so as to limit its exposure or being held responsible for the abuse and to preserve a false image of the Church.  Specifically, the Diocese Defendants created restricted access and secret archives to restrict access and dissemination of documents classified for archival in the respective archives.  (Canons 486 and 489 in 1983 Code of Canon Law ("Code"); Canon 375 and 379 in 1917 Code)

28.     The Bishop is authorized to archive any matter in the secret archive that is regarded as "scandalous," which included matters relating to priests, agents and employees of the Diocese sexually abusing children.  The 1983 Code provided: "Each year documents of criminal cases in matters of morals, in which the accused parties have died or ten years have lapsed from the condemnatory sentence, are to be destroyed.  A brief summary of what occurred along with the text of the definitive sentence is to be retained."  (Section 2, Canon 489; c.f. Canon 379 of 1917 Code, requiring the burning of documents in criminal cases once a year) Only the Bishop is to have the key to secret archives (Canon 490, 1983 Code; Canon 379, 1917 Code), and the documents in the secret archives are to be "protected most secretly" (Canon 489, 1983 Code; Canon 379 of 1917 Code).

29.     Upon information and belief, matters related to McLean's sexual abuses on children

---

molester of children. (See List of Priests attached hereto as Exhibit A)

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

were regarded as "scandalous" and maintained in the secret archive of the Diocese Defendants. As such, and on further information and belief, such documents have been intentionally hidden and perhaps altered or destroyed as called for in the Code, or otherwise hidden and secreted.

30.     In the particular case of McLean his own violations and proclivities were hidden from the members of the diocese, the "faithful", the general public, even those who were parents of minor children who may be exposed to McLean, who the Diocese Defendants knew to be a sexual predator.

31.     It was not until late March 2019 that the Diocese revealed McLean to be a known sex offender. This had been known to the Defendants for decades.

32.     Defendants never reported to proper authorities McLean's criminal activity.

33.     In 1962, the Diocese Defendants expanded on their internal operating procedure of secrecy through adherence to the publication of the "INSTRUCTION," attached hereto as <u>Exhibit B</u> and incorporated by referenced, which was to be stored in the secret archive.  (P. 1).  The INSTRUCTION was issued by the Holy See (colloquially known as the Vatican) and was intended to reach all patriarchs, archbishops, superiors, and diocesan ordinaries (i.e., bishops).  It contains explicit instructions as to how bishops and church leaders are to proceed in cases of child sexual abuse; for example, in matters involving priests who "solicit or provoke" (p. 1 ¶ 1) a penitent "toward impure and obscene matters" (p. 1 ¶ 1), the matter is deemed "<u>a secret of the Holy Office</u>" (p. 3 ¶ 11) and the accused, accusers, and any witnesses are to be given the "oath of keeping the secret" (p. 4 ¶ 13), "under the penalty of excommunication" (p. 3 ¶ 11).

34.     The INSTRUCTION identifies "the worst crime" as: "any perpetrated by a cleric or attempt (sic.) with a person of his own sex."  P. 15, ¶ 71.  Also contemplated by the Instruction were "any obscene, external act, gravely sinful, perpetrated in any way by a cleric or attempted by him

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

with youths of either sex." P. 16, ¶ 73.  The abuses of McLean upon the Plaintiff here qualify as "the worst crime."  Yet, to date, neither McLean nor the Diocese Defendants have atoned to the Plaintiff, her sister, or her family have never made any contact with any of them, nor any civil authority, but rather have hidden away McLean and all records relating to his pernicious acts.

35.     The INSTRUCTION provides that where the Diocese Defendants knew of such crimes, the Diocese Defendants were to assume the duty of locating other victims of the same perpetrator. P. 7, ¶ 29.   If and when the Diocese Defendants adhered to this duty to locate other victims and determined that the allegations were with a foundation, the truth of the matters were kept secret and concealed from other parishioners, law enforcement, and the general public pursuant to the mandate of the Instruction. Likewise, when payments were made to victims of sexual abuse, these payments too were kept secret and concealed.  In fact, such payments were at times laundered through unrelated priests or parishes to the victims, without proper disclosure. The funds used for such payments were funds acquired by the Diocese Defendants, at least in part, from the commercial operation of its schools, its illegal gambling operations, and contributions.

36.     In terms of action taken against the molesting priests and/or agents, the Diocese Defendants rarely or never ousted the molester; instead, the Diocese Defendants would pay the molester to take a sabbatical, provide mental health and/or medical treatment, or transfer him to a different assignment.  At the extreme, the Diocese Defendants, upon information and belief, would move documents or offenders to Rome, where diplomatic immunity could be claimed to resist production or prosecution.

37.     The Diocese Defendants failed in their undertaking of locating additional victims of McLean; to date, they have failed to locate the Plaintiff as a McLean victim; they have never even

12

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

tried. Given the propensity of McLean's victimization of children, the Diocese Defendants' knowledge of such abuse, the Diocese Defendants' knowledge of the relationship McLean had with the Plaintiff's other family members including her mother, the relevant time periods of abuse and McLean's assignments, the Diocese Defendants were grossly negligent in failing to identify the Plaintiff as a victim of McLean.

38. The Appendix of the INSTRUCTION sets out additional terms of secrecy. It provides that the secrecy oath, taken by accusers and witnesses, as well as the accused, is absolute; it is a secrecy to be maintained "under whatever type of pretext, even for the most urgent and most serious cause (sic.) for the purpose of a greater good" unless expressly approved by the Supreme Pontiff (i.e., the Pope). P. 17. No exception is noted for complying with civil authority. Therefore, under the INSTRUCION, the highest obligation - higher than any law, oath, or court order – is to maintain secrecy for the benefit of the perpetrator, the Diocese and the Church.

39. By and under these policies and practices the Diocese Defendants for decades have systemically and fraudulently concealed sexual abuse of children, including of the Plaintiff, at the hands of priests, agents, and employees of the Diocese Defendants, including McLean, an abuser acting under the veil of priesthood. Consistent with the obligation of secrecy, the Diocese Defendants made no effort to either prevent sexual abuse of the Plaintiff by McLean or to ascertain that the Plaintiff was a victim of the known abuses by McLean. Rather they hid McLean and the records relating to him.

40. As a result, Defendants harmed and proximately damaged the Plaintiff, for which she is entitled to recover against the Defendants in such amount as the finders of fact determine.

41. By and under these secret, internal policies and practices the Diocese Defendants for

13

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

decades have systemically and fraudulently secreted that priests have sexually abused children and parishioners.

42.     As a direct and proximate result of the conduct of the Diocese Defendants, described herein, Plaintiff has been injured and suffered damages.  Plaintiff is entitled to a judgment against the Diocese Defendants for actual damages to be determined by the trier of fact, and punitive damage in a sufficient amount to deter such similar conduct by these Diocese Defendants and others.

## FOR A SECOND CAUSE OF ACTION:
## (NEGLIGENCE/GROSS NEGLIGENCE/RECKLESSNESS)

43.     The allegations of paragraphs 1 through 42 above are incorporated into this cause of action as if fully stated herein.

44.     As alleged above, the Plaintiff was the victim of sexual and other assault at the hands of the Diocese Defendants on multiple occasions when she was a child by the acts of Defendants' agent, McLean, who was a priest, advisor, confessor, counselor, and in a position of authority over the Plaintiff, her parents, and her siblings. McLean's duties to the Plaintiff and his abuse of Plaintiff arose from his relationship with the Plaintiff and his employment with the Diocese Defendants and his pastoral functions with Plaintiff and her family, his parishioners.

45.     As a result of the relationships between the Plaintiff and McLean, the Plaintiff and the Diocese Defendants, and/or McLean and the Diocese Defendants, the Diocese Defendants owed duties of due care toward the Plaintiff. Diocese Defendants breached those duties and were negligent, grossly negligent, careless, reckless, willful, or wanton in relation to the Plaintiff, in that they failed to:

a.     Monitor McLean's behavior while acting on behalf of the Diocese and/or while engaging in activities associated with school, church, youth

14

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

development, and pleasure activities wherever same took place with his parishioners;

b.     Properly investigate McLean's background through a proper background and psychological testing, to determine his proclivities toward deviant sexual conduct perpetrated upon individuals such as the Plaintiff;

c.     Address McLean's past conduct either at the time he first became involved with the Diocese Defendants or subsequently;

d.     Ignoring McLean's known predilections toward sexually assaulting minors, when it was known or the Diocese Defendants should have known of those predilections;

e.     Allowing McLean to be with and to work with young children, including the Plaintiff, alone and unsupervised;

f.     Maintain and keep the property and premises where McLean worked in a reasonably safe condition;

g.     Shield the Plaintiff from dangerous conditions, situations and individuals including child predators such as McLean;

h.     Warn the Plaintiff and/or her family of McLean's deviant sexual proclivities;

i.     Fulfill their duties *in loco parentis* to the Plaintiff;

j.     Educate the Plaintiff and/or her family about the dangers of sexual abuse of minors in relations such as those with McLean;

k.     Warn the Plaintiff and/or her family of priests, teachers and other employees of the Defendants known to have a sexual interest in children and known to act inappropriately on that interest;

l.     Supervise McLean in a manner so as to eliminate his chances to sexually abuse children or engage in sexual affairs with married parishioners;

m.     Take steps to report to civil and criminal authorities a priest, agent, and/or employee of the Church/School/Diocese who sexually abused children, so those who consider employing him for jobs having contact with children could make an informed decision about whether or not to do so, or the conditions on which to employ him, and so that parents and children

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

could protect against his predatory actions, and because the law of South Carolina requires such reporting;

m.  Notify parents of those children who have/had been exposed to McLean, and the now adult victims themselves;

n.  Exercise due care for the safety and well-being of Plaintiff and others similarly situated;

o.  Refrain from covering up and hiding McLean's sexually abusive actions.

46.  As a direct and proximate result of the negligent, grossly negligent, reckless, careless, willful, and wanton behavior of the Diocese Defendants and/or their employees/agents, Plaintiff has been injured and directly and proximately suffered damages. Plaintiff is entitled to a judgment against the Defendants for actual damages, and punitive damage in a sufficient amount to deter such similar conduct by these Defendants or others, all as determined by the trier of facts.

### FOR A THIRD CAUSE OF ACTION:
### (BREACH OF FIDUCIARY DUTY)

47.  The allegations of paragraphs 1 through 46 above are incorporated into this cause of action as if fully stated herein.

48.  By and through the relationships described herein, the Diocese Defendants entered into a fiduciary relationship with the Plaintiff. These Defendants induced Plaintiff additionally, by accepting physical custody of the minor Plaintiff, as a parishioner and student at a school of the Diocese of Charleston, the Diocese Defendants assumed the duty to act in *loco parentis* with respect to the Plaintiff. The Diocese Defendants undertook a duty to provide a safe environment for the Plaintiff, as well as for all children and students of the Diocese, at its churches, at its activities, and all interactions by agents and/or employees of the Diocese Defendants with children. A relationship

16

of trust and confidence, and therefore a fiduciary relationship, was formed.

49.     By entering into a fiduciary relationship with Plaintiff, the Diocese Defendants were obligated to act only in the best interests of the Plaintiff.  This duty extended to the Diocese Defendants' agents and employees, McLean included.

50.     Plaintiff reposed trust and confidence in McLean, her teachers, advisors, confessors, and counselors, priests, and nuns, and in the Diocese Defendants.  As a result of McLean's predatory acts described above and the Diocese and Bishop's failure to act properly on McLean's conduct, the Diocese Defendants breached the duties owed to the Plaintiff as well as her entire family, to properly trust, guide, and keep them safe.

51.     As a direct and proximate result of the negligent actions, inactions and breaches of fiduciary duties by the Diocese Defendants and through agents, the Plaintiff was harmed and is entitled to actual, compensatory damages in an amount to be determined by the jury, as well as punitive damages in an amount sufficient to deter similar conduct by these Diocese Defendants and others.

**FOR A FOURTH CAUSE OF ACTION:**
**(OUTRAGE/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

52.     The allegations of paragraphs 1 through 51 above are incorporated into this cause of action as if fully stated herein.

53.     The Diocese Defendants intentionally inflicted severe emotional distress on the Plaintiff or were certain or substantially certain that such distress would result from their conduct and the described conduct of Defendants' agent McLean. The Diocese Defendants' conduct as alleged above was so extreme and outrageous as to exceed all possible bounds of decency and must

be regarded as atrocious and utterly intolerable in a civilized community or society. The actions of the Diocese Defendants caused the Plaintiff emotional distress and the emotional distress suffered was foreseeable and severe such that no reasonable person could be expected to endure it, and it had physical manifestations of pain, loss of sleep, nervousness, stress, and other manifestations throughout Plaintiffs life.

54. As a direct and proximate result of the outrageous conduct of the Diocese Defendants, the Plaintiff has been injured and has directly and proximately suffered damages. Plaintiff is entitled to a judgment against the Diocese Defendants for actual damages to be determined by the trier of fact, and punitive damage in a sufficient amount to deter such similar conduct by these Defendants or others.

## FOR A FIFTH CAUSE OF ACTION:
### (CIVIL CONSPIRACY)

55. The allegations of paragraphs 1 through 54 above are incorporated into this cause of action as if fully stated herein.

56. Prior to the abuse of the Plaintiff, the Plaintiff is informed and believes, two or more individuals, being agents of the Diocese Defendants were aware of McLean's actions regarding Plaintiff and his sexually deviant propensities generally and with minors. The failure of these agents of the Diocese Defendants to report McLean to the proper authorities, the active concealment of their knowledge about McLean's deviant activities, and their agreement to do nothing to stop, or at least report, his activities constitutes a conspiracy, or a conspiracy of silence. The purpose behind this conspiracy was to protect the Diocese Defendants and McLean and Defendants at the Plaintiff's and other McLean victims' expense, proximately resulting in injury to the Plaintiff. The conspiracy of

18

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011

silence constitutes a failure to protect minors who were the potential and/or actual prey of McLean and his sexually deviant propensities, this Plaintiff included.

57.     As a direct and proximate result of the conspiratorial conduct of the Diocese Defendants, the Plaintiff has been injured and suffered damages.  Plaintiff is entitled to a judgment against the Diocese Defendants for actual damages to be determined by the trier of fact, and punitive damage in a sufficient amount to deter such similar conduct by these Diocese Defendants or others.

## FOR A SIXTH CAUSE OF ACTION:
### (NEGLIGENT RETENTION OR SUPERVISION)

58.     The allegations of paragraphs 1 through 57 above are incorporated into this cause of action as if fully stated herein.

59.     McLean was hired by authorized agents of for the Diocese Defendants, or the Diocese Defendants themselves, prior to the abuse upon the Plaintiff and the ensuing coverup.

60.     The agents for the Diocese Defendants knew or should have known about McLean's sexually deviant propensities and his propensities to take advantage of his flock, his parishioners. Despite such knowledge, the agents of the Diocese Defendants failed to take steps to protect the minors Saint John Church and School, including the minor Plaintiff.

61.     Despite having knowledge of McLean's sexually deviant propensities with minors and his propensities to take advantage of those who he was supposed to care for, lead, guide, and protect, the Diocese Defendants directly or through agents continued to retain him as youth leader, confessor, counselor, and teacher, without warning the parents of children, or the children at Saint John Church and School, who were his potential prey.  Several of these children, Plaintiff included, became McLean's actual prey.

62.     Despite having knowledge of McLean's sexually deviant propensities with minor children, the agents of the Defendants did not properly supervise him. Consequently, he was able to continue to perpetrate his sexually deviant attacks on minors and others.

63.     Plaintiff was a minor child attending Saint John Church and School, where McLean had access to her as a member of his flock. Therefore, if not for McLean's continued employment by the Diocese Defendants, the Plaintiff would not have been in contact with or injured by McLean.

64.     Plaintiff was a minor child who was injured because the agents of the Diocese Defendants failed to supervise McLean even though they knew or should have known of his sexual propensities with minors and/or others who were induced to place trust and confidence in him.

65.     As a direct and proximate result of the Diocese Defendants' negligent conduct, the Plaintiff sustained and continues to sustain injuries and damages described herein and therefore is entitled to receive actual, compensatory damages in an amount to be determined by a jury, and punitive damages in a sufficient amount to deter similar conduct by these Diocese Defendants or others.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests actual, compensatory and punitive damages against the Defendants in amounts to be determined by the finder of fact for the various causes of action set forth above, that the costs of this action be taxed against the Defendants, and such other and further relief as the Court shall deem just and proper.

Respectfully submitted,

THE RICHTER FIRM, LLC


By: s/Lawrence E. Richter, Jr.
Lawrence E. Richter, Jr.
Anna E. Richter
622 Johnnie Dodds Blvd
Mt. Pleasant, SC 29464
 (843) 849-6000
ATTORNEYS FOR PLAINTIFF

4th day of January, 2021
Mount Pleasant, South Carolina

ELECTRONICALLY FILED - 2021 Jan 04 3:07 PM - CHARLESTON - COMMON PLEAS - CASE#2021CP1000011