IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Mary Roe 1818, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> The Bishop of Charleston, A Corporation ) <br> Sole, and the Bishop of the Diocese of ) <br> Charleston, In His Official Capacity, ) <br> ) <br> Defendants. ) <br> _____ ) | Civil Action No. 2:21-cv-20-RMG <br><br><br><br><br><br> **ORDER AND OPINION** |

Before the Court are various motions for summary judgment filed by Defendants. (Dkt. Nos. 63, 64, 66, and 68). Also before the Court is a motion to strike filed by Defendants. (Dkt. No. 80). For the reasons stated below, the Court rules as follows.

### Background

Plaintiff alleges she was abused by Frederick McLean, a priest of the Diocese of Charleston, sometime between 1961-1966, while she and her family were members of St. John Church in North Charleston. *See, e.g.*, (Dkt. No. 68-1 at 1) (stating Plaintiff "claims she was molested by Fr. Frederick McLean in 1962 or 1963 when she was three or four years old); (Dkt. No. 71 at 1) ("Plaintiff was abused by Frederick McLean, a priest of the Diocese of Charleston, during a time period of 1961-1966[.]").

On January 4, 2021, Plaintiff filed a lawsuit against Defendants in the Charleston County Court of Common Pleas, (Dkt. No. 1-1), which Defendants removed to federal court, (Dkt. No. 1).

Plaintiff brings claims for: (1) fraudulent concealment; (2) negligence/gross negligence/recklessness; (3) breach of fiduciary duty; (4) outrage/intentional infliction of emotional distress; (5) civil conspiracy; and (6) negligent retention or supervision.

1

On December 3, 2021 Defendants filed various motions for summary judgment: (1) motion for summary judgment based upon the doctrine of charitable immunity, (Dkt. Nos. 63, 77); (2) motion for summary judgment on all claims based upon the statute of limitations, (Dkt. Nos. 64, 78); (3) motion for summary judgment regarding "The Bishop of the Diocese of Charleston, in His Official Capacity," (Dkt. No. 66); and (4) motion for summary judgment based upon individual causes of action, (Dkt Nos. 68, 79). Plaintiff opposes Defendants' motions for summary judgement. (Dkt. Nos. 70, 71, 72, 73). Defendants also filed a motion to strike an attachment to Plaintiff's complaint and attachments to two of Plaintiff's oppositions to Defendants' motions for summary judgment. (Dkt. No. 80). Plaintiff opposes that motion as well. (Dkt. No. 85).

Defendants' motions are fully briefed and ripe for disposition.

## **Legal Standard**

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if

the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## Discussion

Defendants argue that all of Plaintiff's claims are barred by the doctrine of charitable immunity. *See generally* (Dkt. No. 63-1). Plaintiffs argue that Defendants are "estopped" from invoking the immunity because of a fundraising evening Defendants held in 2017 called "A Night in Monte Carlo" which involved "bingo, raffles, drawings, door prizes, lotteries, and other games of chance." (Dkt. No. 72 at 6-7, 15-16) (arguing that because the event generated a "profit" Defendants were engaging in "commercial activities" unrelated to their charitable function). *Contra* (Dkt. No. 77 at 2) (noting the "Bishop England High School Parents Guild sponsored a Casino fundraiser—at which the 'gambling' was all pretend, no actual money was wagered, won or lost—in 2017"). Plaintiff further argues that to the extent the doctrine is even applicable, it does not bar Plaintiff's intentional tort claims.

The South Carolina Supreme Court first espoused the doctrine of charitable liability in 1914: "A charitable corporation is not liable to injuries, resulting from the negligent or tortious acts of a servant, in the course of his employment, where such corporation has exercised due care in his selection." *Lindler v. Columbia Hospital*, 81 S.E. 512, 512-13 (1914). In 1981, that court "completely abolished" the doctrine, *see Laughridge v. Parkinson*, 403 S.E.2d 120, 121 (S.C. 1991), announcing that it "has no place in today's society" and holding that "a charitable institution is subject to liability for its tortious conduct the same as any other person or corporation," *Fitzer v. Greater Greenville of South Carolina Y.M.C.A.*, 282 S.E.2d 230, 232 (S.C. 1981). But the 1981 abrogation was only prospective. *Hupman v. Erskine College*, 314 S.E.2d 314, 315 (S.C. 1984). To determine whether the doctrine applies, the triggering event is not when the claim was filed,

3

but rather when the cause of action arose.[1] *See Laughridge*, 403 S.E.2d at 121. Here, Plaintiff's claims arose before *Fitzer*, thus the doctrine of charitable immunity is applicable.

The next question is whether Defendants fall under the 1960s doctrine's protection. The test is whether the corporation had, at the relevant time, a charitable rather than commercial "character, kind or purpose." *Eiserhardt*, 111 S.E.2d at 570. "[T]he charitable character of a corporation depends upon the facts and its charter is not conclusive." *Id.* Even if the corporation was incorporated under its state's statute authorizing charter for charitable or eleemosynary corporations, the Court must be mindful that "[i]n a tort action against such corporation, its true nature may be shown from the manner in which it conducts its business as well as from its articles of incorporation, and on the trial of the case any competent evidence may be offered with respect to the actualities of its operations." *Id.* As evidence of such "true nature" the Court may look at whether the claim arose from the defendant's "operation of ... a commercial venture wholly unconnected with its charity, to which immunity would not extend." *Id.* "Of course, what activity will or will not constitute the necessary connection with or direct relation to the charitable enterprise for which the particular charity was organized and is operated will depends upon the facts of each case." *Id.* at 572-73.

Here, Defendants have put forth evidence establishing that, from 1961-1966, Defendants were a charitable organization. Attached to Defendants' motion is an affidavit from their current CFO John Barker. (Dkt. No. 63-2). Therein, Barker notes that the Defendant Diocese does

---

[1] This may be different from when a tort claim accrues under its statute of limitations. Plaintiffs claiming sexual abuse as a minor have been cautioned against superimposing the discovery rule, relevant to the statute of limitations, onto the analysis of which era of the charitable immunity doctrine applies. *See, e.g.*, *Doe v. The Diocese of Charleston*, 2003 WL 25456994 (S.C. Ct. Common Pleas, Jan. 10, 2003) ("The statute of limitations is an utterly different creature from the Doctrine of Charitable Immunity.... The date of discovery has nothing to do with whether or not the charity was immune at the time of the tort.").

"business as Bishop of Charleston, a Corporation Sole. The Corporation Sole was created by Act of the General Assembly of South Carolina approved on December 13, 1880. The Corporation Sole, from its inception and through the current day was, and is, a non-profit religious corporation." (*Id.* ¶ 4) (internal citation omitted). Barker further notes that since "at least 1946, the I.R.S. has issued a Group Letter Ruling to the United States Conference of Catholic Bishops recognizing the charitable status of each Catholic diocese in the United States, together with the parishes, schools, ministries, and other affiliated ministries or entities that are listed in the Catholic Directory for each diocese." (*Id.* ¶ 5). Barker continues that, for the "years 1961 – 1966," the "Diocese of Charleston[]" was listed therein. (*Id.*). Barker further affirms that the "Diocese operates schools throughout South Carolina as part of its evangelical mission, and not for commercial purposes." (*Id.* ¶ 6); *see* 26 U.S.C. § 7611 (no private right of action to challenge a church's charitable status); *see also* Declaration of Msgr. Anthony Droze, Vicar of the Diocese of Charleston, (Dkt. No. 63-6) (affirming that "catholic schools are an essential and vital part of the Church's evangelical mission").

The Court finds that Defendants are charitable institutions. As described above, Defendants have put forth evidence establishing their charitable status in the 1960s—a charitable status related to the activities which Plaintiff alleges gave rise to her claims. *See, e.g.*, (Dkt. No. 1-1 ¶ 13) ("Plaintiff came to know the priest McLean through Saint John Church and School, and through counseling and mentoring offered by McLean to plaintiff and her family."); (*Id.* ¶ 44) ("McLean's duties to the Plaintiff and his abuse of Plaintiff arose from his relationship with the Plaintiff and his *employment with the Diocese Defendants and his pastoral functions* with Plaintiff and her family, his parishioners.") (emphasis added); (*Id.* ¶ 48) ("The Diocese Defendants undertook a duty to provide a safe environment for the Plaintiff, as well as for all children and

5

students at the *Diocese, at its churches, at its activities*, and all interactions by agents and/or employees of the Diocese Defendants with children.") (emphasis added). As noted previously, Plaintiff's only challenge to this finding, based on admissible evidence, is that Defendants are "estopped" from invoking the immunity because of a fundraising evening Defendants held in 2017 called "A Night in Monte Carlo" which involved "bingo, raffles, drawings, door prizes, lotteries, and other games of chance." (Dkt. No. 72 at 6-7, 15-16). As Defendants note, however, the night in question was for a charitable purpose, (Dkt. No. 77 at 2) (The "Bishop England High School Parents Guild sponsored a Casino fundraiser—at which the 'gambling' was all pretend, no actual money was wagered, won or lost—in 2017."), and, in any event, occurred *half a century* after the events at issue here. Even if a "A Night in Monte Carlo" were found to be a commercial activity outside of Defendants' charitable purpose, Plaintiff presents no for authority for why an event in 2017 would deprive Defendants of immunity possessed in the *1960*s.

The Court further finds that, from 1961-1966, the doctrine of charitable immunity would have barred the entirety of Plaintiff's claims.

The doctrine of charitable immunity was espoused in South Carolina in *Linder v. Columbia Hospital of Richmond County,* 98 S.C. 25, 81 S.E. 512 (1914): "The rule is thus stated in 6.CYC.975, 976: 'A charitable corporation is not liable to injuries, resulting from the negligent or tortious acts of a servant, in the course of his employment, where such corporation has exercised due care in his selection." *Linder,* 81 S.C. at 512- 513.

The doctrine was further developed in *Vermillion v. Williams College of Due West,* 104 S.C. 197, 88 S.E. 649 (1916), which stated: "These differences and the facts of the two cases make no difference in the applicable law, because the exemption of public charities from liability and actions for damages for tort rests not upon the relation of the injured party to the charity, but upon

6

grounds of public policy, which forbids the crippling or destruction of charities which are established for the benefit of the whole public to compensate one or more individual members of the public for injuries inflicted by the negligence of the corporation itself or of its superior officers, or agents, or of its servants or employees. The principle is that in an organized society, the rights of the individual must, in some instances, be subordinated to the public good … that being so, what difference can it make whether the tort is out of the corporation itself or its superior officers and agents of that of its servants, liability for the one would effectually embarrass or sweep away the charity as the other. It would therefore be illogical to admit liability for one and deny it for the other." *Vermillion*, 88 S.E. at 650.

In 1959, the Supreme Court decided *Eiserhardt v. State Agricultural and Mechanical Society of South Carolina,* 235 S.C. 305, 111 S.E. 2d 568 (1959), which, although affirming the doctrine of charitable immunity, did not extend the Doctrine to activities outside the scope of the charitable organization's mission.

The Supreme Court again reaffirmed the doctrine in a case previously decided in favor of Defendant, in *Decker v. Bishop of Charleston,* 247 S.C. 317, 147 S.E.2d 264 (1966). In *Decker*, the plaintiff was injured while attending a church service at the Cathedral of St. John the Baptist. The Supreme Court stated: "It is our conclusion that the Doctrine of Charitable Immunity should not be over-ruled. The Doctrine is particularly applicable in this case. Here we have a true charity, the Church, engaged in conducting a religious service and, in which, Carolyn Gaul Schmicht was participating at the time of her injury." *Decker,* 147 S.E.2d at 267-68 (further stating that "the question has been settled in this jurisdiction by the adoption of full immunity of such institutions from the torts of their agents and servants") (citing *Caughman v. Columbia Y.M.C.A.*, 212 S.C. 337 (1948)).

The Doctrine of Charitable Immunity was abolished in *Fitzer v. Greater Greenville South Carolina Young Men's Christian Association,* 277 S.C. 1, 282 S.E.2d 230 (1981), which stated: "We hold a charitable institution is subject to liability for its tortuous conduct the same as other person or corporation. The Doctrine of Charitable Immunity is abolished in its entirety and the case is reversed and remanded for trial." *Fitzer,* 282 S.E.2d at 231-32.

The South Carolina Supreme Court has made it clear that the application of the abolition of the doctrine was not to be applied retroactively. "We hold that the Doctrine of Charitable Immunity announced in *Fitzer v. Greater Greenville South Carolina Young Men's Christian Association* applies prospectively only." *Hupman v. Erskine College,* 281 S.C. 43, 314 S.E.2d 314 (1984) (internal citation omitted).

In deciding this matter, the Court finds instructive *John DOE, Plaintiff, v. THE DIOCESE OF CHARLESTON and Jane Doe, Defendant.*, No. 02-CP-10-0770, 2003 WL 25456994 (S.C. Com. Pl. Jan. 10, 2003). In *Doe*, the plaintiff alleged that he was abused while a minor student at an elementary school owned by Defendants beginning in 1959/1960. The plaintiff brought claims like those here including outrage, breach of fiduciary duty, negligent supervision, and fraudulent concealment. After summarizing the applicable law, the court held:

> Applying these principles, it is clear that Plaintiff's claims are barred by the Doctrine of Charitable Immunity. The Plaintiff has no facts in dispute that the Defendant, Diocese, is a charitable institution and Sacred Heart School, its officers, agents and employees, are all part of a charitable organization. The Plaintiff concedes these facts for the purposes of this hearing. Furthermore, there is no contention, and neither does the Plaintiff raise one, that the scope or nature of the school's function was operated outside the charitable parameter's of the Diocese during the time in question. It is undisputed that the Diocese and Sacred Heart were, and are, "charities" under South Carolina law. It is undisputed that the events in question occurred before the abolition of the Doctrine of Charitable Immunity in 1981, and even before the Supreme Court's *prospective* limitations on its application, such as the intentional torts exception in 1973. *Accordingly, at the time of the events in question, it was the law of South Carolina that charities were immune as to all tort liability.* Moreover, even if the Court were to apply the

8

> intentional torts exception retroactively, the Diocese would still be immune. Certainly, *Edward Fischer's heinous acts were intentional and criminal, but there are no allegations in the Complaint, nor are there any facts offered by the Plaintiff, suggesting that the Plaintiff's injuries were caused by intentional acts of the Diocese itself.* The allegations in the Complaint are a quintessential claim for negligence.

*Id.* (emphasis added).

So too here. From 1961-1966, there is no question that the doctrine of charitable immunity was in full force and effect. *See* (Dkt. No. 72 at 14) ("Plaintiff agrees that her causes of action arose in the approximate time period of 1961-1966, and that the South Carolina Supreme Court did not fully abolish the Doctrine of Charitable Immunity until 1981[.]"). Further, as established above, the Court finds undisputed that Defendants operated as, and indeed were, a charitable institution during the period in question and that Plaintiff's claims—quintessentially negligence claims—arose from those activities.[2] *See, e.g.*, (Dkt. No. 1-1 ¶ 44) ("McLean's duties to the Plaintiff and his abuse of Plaintiff arose from his relationship with the Plaintiff and his *employment with the Diocese Defendants and his pastoral function*s with Plaintiff and her family, his parishioners.") (emphasis added); (*Id.* ¶ 48) ("The Diocese Defendants undertook a duty to provide a safe environment for the Plaintiff, as well as for all children and students at the Diocese, at its *churches, at its activities, and all interactions by agents and/or employees* of the Diocese Defendants with children.") (emphasis added); *Decker*, 247 S.C. at 323 (noting that "under our decisions chartable institutions or corporations, on grounds of public policy, enjoy full immunity

---

[2] The Court notes that the alleged perpetrator, Father McLean, is not a party to this action. Were he, and were Plaintiff's allegations proven to be true, there is little doubt that he would be held liable for his reprehensible acts. The Court has great sympathy for Plaintiff. But, as explained *supra*, the defendants here are the Diocese of Charleston. And, for the reasons explained above, Defendants are entitled, under the doctrine of charitable immunity, to summary judgment on the entirety of Plaintiff's claims.

9

from tort liability"). Accordingly, the doctrine would have barred Plaintiff's claims had they been brought in 1966.

### Conclusion

For the reasons stated above, the Court grants Defendants' motion for summary judgment based on the doctrine of charitable immunity (Dkt. No. 63). Defendants' remaining motions are denied as moot. The Clerk is directed to close this case.

**AND IT IS SO ORDERED**.

s/ Richard M. Gergel<br>
Richard M. Gergel<br>
United States District Judge

May 17, 2022
Charleston, South Carolina